<u>NOT FOR PUBLICATION</u>

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION<br><br>    Plaintiff,<br><br>v.<br><br>FAPS, INC. et al.<br><br>    Defendants. | Civil Action No.: 10-3095 (PGS)<br><br>**MEMORANDUM AND ORDER** |

Currently before the Court is an application by Plaintiff Equal Employment Opportunity Commission ("EEOC") for sanctions. Specifically, the EEOC seeks: (1) an order directing defense counsel to disclose all materials, documents, notes and communications between defense counsel or defense counsel's agents, and the EEOC claimants; (2) an order preventing Defendant from using any materials, statements, mental impressions and information obtained by defense counsel from the EEOC claimants; and (3) an order permitting the EEOC to depose persons representing Defendant who received information, directly or indirectly, from the EEOC claimants, including but not limited to employees and agents of a private investigative firm. EEOC's Letter, July 26, 2013 at 6. For the reasons discussed below, the Court will **GRANT**, in part, and **DENY**, in part, the EEOC's application.

I.   INTRODUCTION

   A.   <u>Relevant Facts</u>

The EEOC seeks intervention by the Court to stop DeCotiis, FitzPatrick & Cole, LLP, counsel of record for Defendant FAPS, Inc. ("Defendant" or "FAPS"), from using a private

investigator to conduct *ex parte* interviews of the claimants and potential claimants in this EEOC action. The EEOC brought this action under Title VII of the Civil Rights Act of 1964, Title I of the Americans with Disabilities Act of 1990, and Title I of the Civil Rights Act of 1991 to "correct unlawful employment practices on the basis of race and disability, and to provide relief to a class of potential and actual applicants who were adversely affected by such practices." Compl. at 1.

On July 2, 2013, the Court received a letter on behalf of the EEOC claiming that defense counsel had hired a private investigator to conduct *ex parte* interviews of the 28 claimants and potential claimants listed in the EEOC's Second Amended Rule 26 disclosures.[1] EEOC's Letter, July 2, 2013 at 1. The EEOC emailed counsel directly, demanding that the private investigator cease all interviews with the claimants, as well as seeking copies of all information "including written statements, questionnaires and/or notes, obtained by the private investigator." See EEOC's Letter, July 2, 2013.

On July 3, 2013, Defendant submitted a letter to the Court opposing the EEOC's application. Specifically, Defendant claims that the attorney-client privilege does not exist as between the EEOC and the claimants, and that the private investigator was instructed to terminate interviews and all contact with the claimants if they informed the investigator that they were represented by counsel. Defendant's Letter, July 3, 2013 at 5.

Following a hearing on July 23, 2013, the EEOC submitted a Certification to the Court, certifying that four of the claimants interviewed by the private investigator disclosed that they were unaware that the private investigator had been hired by Defendant's counsel. DiSavino Cert. at 4.

---

[1] Although the EEOC's October 6, 2011 Letter references 29 claimants, during the July 23, 2013 hearing, counsel for both parties agreed that the list of claimants is now 28 persons.

2

On July 26, 2013, August 2, 2013 and August 7, 2013, the EEOC submitted additional Declarations on behalf of Walter Anderson, Schakeera Walker, Darryl Britt, Harvey Glenn and James Giles, claimants who were interviewed by the private investigator.  Both Mr. Anderson and Ms. Walker declared that the private investigator affirmatively mislead them by saying that he "was with the EEOC" or that "he worked for Rosemary DiSavino". Anderson Decl. at ¶ 5; Walker Decl. at ¶ 4.  The three other claimants assumed the private investigator worked for the EEOC, even though the investigator said that he "worked for FAPS" or with "CTS Research" ("CTS"). Britt Decl. at ¶ 5; Glenn Decl. at ¶ 4; Jiles Decl. at ¶ 4.  All five claimants certified that they are represented by the EEOC.  Anderson Decl. at ¶ 5; Britt Decl. at ¶ 2, ; Glenn Decl. at ¶ 2; Jiles Decl. at ¶ 2 ; Walker Decl. at ¶ 2.

During interviews with four of the five claimants, the private investigator apparently did not ask whether the claimants were represented by the EEOC or other counsel.  Britt Decl. at ¶ 6; Glenn Decl. at ¶ 7; Jiles Decl. at ¶ 5. For example, Mr. Walker claims he informed the investigator that he was represented by counsel; the investigator, however, continued the interview.  Walter Decl. at 5.  On August 12, 2013, Defendant submitted Certifications from the private investigators which disputed some or all of allegations in the claimants' Certifications.

### B.     Procedural History

Pursuant to the Court's September 25 2012 Scheduling Order, fact discovery was set to close on November 15, 2012. See dkt. no. 73. Because of the effects of Hurricane Sandy, on November 19, 2012, the Court granted FAPS' request for a stay and entered an Order staying this action for a period of 90 days. See dkt. no. 79. In an Order dated April 4, 2013, the Court further extended the deadline for completion of fact discovery to June 14, 2013. See dkt. no. 81. Fact discovery was further extended until June 28, 2013 for limited purpose of allowing the

parties to depose a union representative from former third party defendant Local 1478. See dkt. no. 85.

## II.     LEGAL STANDARDS

### 1.     Parameters of attorney-client relationship in EEOC actions

Courts have reached different conclusions with respect to the parameters of the attorney-client relationship between the EEOC and claimants or potential claimants. Indeed, the case law "is not definitive regarding the moment when the EEOC enters into an attorney-client relationship with members of the class it seeks to represent." EEOC v. Morgan Stanley & Co., 206 F.Supp.2d 559, 561 (S.D.N.Y. 2002). Courts find it problematic to expressly define this relationship because the EEOC represents the public interest, allowing claimants and potential claimants to bring individual actions. Id. at 4 (citing EEOC v. Johnson & Higgins, Inc., 1998 WL 778369, at *5-6 (S.D.N.Y. Nov. 6, 1998)).

In EEOC v. Dana Corp., the Court held that until there is proof of an established attorney-client relationship between the EEOC and a class member or potential class member, the opposing party is permitted to engage in *ex parte* communication with the claimants. 202 F. Supp. 2d 827, 830 (N.D. Ind. 2002). Conversely, in EEOC v. Morgan Stanley & Co., Inc. the Court found that "all women defined in the class are to some degree represented by the EEOC." 206 F. Supp. 2d 559, 560 (S.D.N.Y. 2002) aff'd sub nom. EEOC v. Morgan Stanley & Co., 2002 2002 WL 1431685 (S.D.N.Y. July 1, 2002).

To prove the existence of an attorney-client relationship, some courts require the EEOC to provide evidence that potential claimants expressly contacted the EEOC to represent them. EEOC v. McDonnell Douglas Corp., 948 F.Supp. 54, 55 (E.D.Mo. 1996). In the same vein, other courts have found affidavits from claimants stating that they sought legal advice from the

4

EEOC "with the understanding that their communications were confidential," sufficient to establish an attorney-client relationship. EEOC v. HBE Corp., 1994 WL 376273, at *2 (E.D.Mo. May 19, 1994).

Although several jurisdictions allow *ex parte* communications with EEOC claimants prior to the establishment of the attorney-client relationship, *ex parte* communications should be undertaken with caution. EEOC v. Dana Corp., 202 F. Supp. 2d at 830. While permitting defense counsel to engage in *ex parte* communication with potential claimants, the court in EEOC v. Dana Corp. warned counsel that it ran "the risk of running afoul of Rule 4.2 should it conduct ex parte communications with a represented party and should be extremely careful before proceeding." Id.[2]  Ideally, a determination of whether an attorney-client relationship exists should, therefore, occur prior to any *ex parte* communication.  Id.

### 2. Effect of employment status on the attorney-client relationship

The employment status of the claimant plays an important role in determining the parameters of any attorney-client relationship. Courts are more likely to find attorney-client relationships between the EEOC and claimants when those claimants are the defendant's current employees. See  EEOC v. Morgan Stanley, 206 F.Supp. 2d at 56, 563 (noting that "coercion of potential class members by the class opponent may exist if both parties are involved in an

---

[2] The New Jersey equivalent of Indiana Rule of Professional Conduct 4.2 is NJ RPC 4.2, which, in relevant part, provides:

> In representing a client, a lawyer shall not communicate about the subject of the representation with **a person the lawyer knows, or by the exercise of reasonable diligence should know, to be represented by another lawyer in the matter,** including members of an organization's litigation control group as defined by RPC 1.13, unless the lawyer has the consent of the other lawyer or is authorized by the law to do so, or unless the sole purpose of the communication is to ascertain whether the person is in fact represented by counsel. (emphasis supplied).

'ongoing business relationship'") (citing Ralph Oldsmobile, Inc. v. General Motors Corp., 2001 WL 1035132, at *3 (S.D.N.Y. Sept. 7, 2001) (quoting Kleiner v. First Nat'l Bank, 751 F.2d 1191, 1201 (11th Cir. 1985))).

In determining the scope of the attorney-client relationship in EEOC cases, the Court must attempt to "balance the interest of the parties in representing their respective positions and the interest of class members in being free from inappropriate influences" while crafting "a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances." Id. (citing Gulf Oil Co. v. Bernard, 452 U.S. 89, 101-02). To achieve this balance between limiting *ex parte* communication without overly restricting speech, the Court in EEOC v. Morgan Stanley allowed ex parte communication with potential class members while instituting safe guards to protect potential class members from undue influence.[3] 206 F.Supp.2d at 563. Conversely, as former employee or non-employee class members are not subject to the same coercive hazards as employee class members, the need to limit *ex parte* communications is therefore not as pressing. EEOC v. TIC-The Indus. Co. et al, WL 3154977 at *6 (E.D. L.A. Nov. 21, 2002).

### C. Scheduling Orders

Pursuant to FED. R. CIV. P. 16(b), a pretrial scheduling order may be "modified only for good cause and with the judge's consent." The Advisory Committee Notes suggest good cause is met only when the schedule set "cannot reasonably be met despite the diligence of the party seeking the extension." However, the Court "has great discretion in determining what kind of showing the moving party must make in order to satisfy the good cause requirement of FED. R.

---

[3] These safeguards included informing potential class members of the: (1) the existence of the pending lawsuit; (2) that it is unlawful for Morgan Stanley to retaliate against them; (3) that they are not required to join the EEOC action; and (4) that they have a private right of action. EEOC v. Morgan Stanley, 206 F.Supp.2d at 563.

6

CIV. P. 16(b)." Patterson v. City of Perth Amboy, 2007 WL 3054939, at *1 (D.N.J. Oct. 11, 2007) (citation omitted).

If a party fails to comply with Rule 16, the court has wide discretion to "issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)–(vii) . . . ." FED. R. CIV. P. 16(f). The sanctions included in FED. R. CIV. P. 37(b)(2)(A)(ii)-(vii) include:

> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
> (iii) striking pleadings in whole or in part;
> (iv) staying further proceedings until the order is obeyed;
> (v) dismissing the action or proceeding in whole or in part;
> (vi) rendering a default judgment against the disobedient party; or
> (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

## III. DISCUSSION

### A. Improper Conduct

Here, the EEOC claims that defense counsel violated NJ R.P.C. 4.2 by sending a private investigator to engage in *ex parte* communications with the claimants. EEOC's Letter, July 2, 2013 at 1. The EEOC requests that Defendant be prohibited from engaging in *ex parte* communications with the claimants and be required to disclose all information obtained from the interviews. EEOC's Letter, July 19, 2013 at 1-2.

Defendant, in opposition, asserts that the claimants "are not named charging parties" and, as a result, the attorney-client privilege does not prevent them from engaging in *ex parte* communications. Defendant's Letter July 3, 2013.

Initially, the Court notes that the claimants' employment status does not weigh in favor of finding an attorney-client relationship. FAPS denied employment to the 28 claimants listed in the October 6, 2011 letter. Since the claimants are not FAPS employees, there is a stronger

7

presumption against the existence of an attorney-client relationship than in support of it. See EEOC v. Morgan Stanley, 206 F.Supp.2d at 563.

Nevertheless, it seems unlikely that Defendant's private investigator took sufficient precautions to determine whether an attorney-client relationship existed between the EEOC and the claimants prior to engaging in *ex parte* communications. The Court in EEOC v. Dana Corp. warned that counsel "should be extremely careful before proceeding." 202 F. Supp. 2d at 830. In other words, counsel should attempt to determine whether the claimants are represented by the EEOC prior to engaging in *ex parte* communications. According to the claimants' Declarations, the private investigator proceeded with the interviews without inquiring if the claimants were represented by the EEOC. Likewise, it appears the investigator did not stop the interviews if and when the claimants stated that they were represented by counsel. Britt Decl. at ¶ 2; Glenn Decl. at ¶2; Jiles Decl. at ¶ 2; Walker Decl. at ¶ 2. Although Defendant disputes these allegations, there is nonetheless sufficient indicia of wrongdoing for the Court to conclude some level of misconduct occurred.

### B. Scheduling Order

Notwithstanding the questionable propriety of the private investigators' actions, both parties are in violation of the Court's Case Management Order ("CMO"). See dkt. no. 81. Although fact discovery closed on June 14, 2013, both parties continued to engage in discovery.[4]

Defendant's counsel explained that the interviews with potential claimants were undertaken to "get to the bottom of what exactly [] supports the assertion of the government's claim." Defendant's Letter, July 3, 2013 at 2. In furtherance of this goal, Defendant engaged

---

[4] Fact discovery was extended to June 28, 2013, but only for limited purpose of allowing the parties to depose a union representative from former third party defendant Local 1478. See dkt. no. 85.

CTS, a licensed private investigator, to interview potential claimants. See Decl. of G. Frino at ¶ 1. CTS began interviewing claimants on June 27, 2013, nearly two weeks after fact discovery closed. See Decl. of C. Taylor at ¶ 2. At no time was either the EEOC or the Court made aware of the fact that Defendant had retained CTS and was engaging in further discovery.

During the July 23, 2013 hearing, counsel for the EEOC also admitted to conducting fact discovery outside the bounds of the CMO. Indeed, the EEOC's expert, Dr. Palmer Morrel-Samuels, mailed 851 written questionnaires and attempted to contact, by telephone, additional FAPS applicants. EEOC's Letter, July 26, 2013 at 5-6. Four current FAPS employees also received questionnaires, and several responses were received after the June 28, 2013 deadline. Id. The EEOC's counsel expressly admitted "that these questions about race constituted some limited 'fact collection'" performed after expiration of the fact discovery deadline set by the CMO. Id.

### C. Conclusion & Sanctions

Although the EEOC attempts to show "the vast difference between the intentionally deceptive tactics undertaken by [defense counsel] and the limited race-identification inquiry made by the EEOC," EEOC's Letter, July 26, 2013 at 2, at the core, both parties have violated the CMO. See dkt. no. 81. Therefore, both parties must immediately cease all fact discovery undertakings and are prohibited from engaging in any future discovery.

In addition, irrespective of the attorney-client privilege issue, it appears to the Court that Defendant's agents engaged in some level of wrongdoing with respect to their communications with the potential claimants. That is to say, neither defense counsel nor the private investigators exercised sufficient diligence in determining whether the claimants were represented. Likewise, the private investigators may have concealed the fact that they were working for FAPS.

As a result, Defendant is directed to disclose all materials, documents, notes and communications between defense counsel or defense counsel's agents (i.e., CTS) and the EEOC claimants. Furthermore, Defendant is prohibited from using any information gleened from the CTS investigation. Finally, Defendant is prohibited from engaging in additional *ex parte* communications with EEOC claimants and potential claimants.

As fact discovery has now concluded, the EEOC's request to conduct further depositions is denied.

## IV.   CONCLUSION & ORDER

The Court having considered the papers submitted and opposition thereto pursuant to FED. R. CIV. P. 78, and for the reasons set forth above;

**IT IS** on this 9th day of September, 2013,

**ORDERED** that the EEOC's Application is **GRANTED**, in part, and **DENIED**, in part, as set forth above; and it is further

**ORDERED** that both Parties are directed to cease any further discovery efforts.

s/ Douglas E. Arpert<br>
**DOUGLAS E. ARPERT, U.S.M.J.**